**LORAIN COUNTY CHILDREN SERVICES, Appellee,**

v.

**KEENE, Appellant.**

[Cite as *Lorain Cty. Children Serv. v. Keene* (1997), 118 Ohio App.3d 535.]

Court of Appeals of Ohio,
Ninth District, Lorain County.

Nos. 96CA006417 and 96CA006431.

Decided March 5, 1997.

*Michael D. Illner,* Lorain County Assistant Prosecuting Attorney; *Timothy Smith* and *Freddie Springfield,* for appellee.

*James A. Deery, Faye S. List* and *Geneva Chadwick,* for appellant.

MILLIGAN, Judge.

Appellant, Patricia Adkins, f.k.a. Patricia Brown, appeals from the judgments of the Lorain County Court of Common Pleas that granted permanent custody of

two of her children, Joshua Brown and James, Keene, Jr., to Lorain County Children Services ("LCCS"). We affirm.

Adkins filed two separate appeals from the trial court's judgments granting LCCS permanent custody of Joshua and James. Because only one brief was filed, raising issues as to each child, we address them in a joint opinion. The facts and issues pertaining to each child are different, however, and will be discussed separately.

LCCS first moved for temporary custody of Joshua on May 29, 1990, when he was six months old. For a variety of reasons, including Adkins's leaving Ohio, losing contact with LCCS, and later returning to the state, the order of temporary custody was extended numerous times. LCCS first moved for permanent custody of Joshua on May 22, 1992, almost two years after Joshua had been removed from his mother's home. In late 1992, however, LCCS found a relative with whom Joshua could potentially be placed. Joshua, then three and a half, was later placed in the legal custody of the relative, Mackie Gibson, and his wife Katherine. The trial court terminated LCCS's temporary custody of Joshua at that time and granted it an order of protective supervision.

Unfortunately, due to Mackie Gibson's health problems, the placement proved unsuccessful. Consequently, the Gibsons agreed to surrender custody of Joshua to LCCS. On January 3, 1994, Joshua was returned to the temporary custody of LCCS pursuant to R.C. 5103.15. On February 3, 1994, LCCS again moved for permanent custody of Joshua. Adkins filed a motion to dismiss, contending that the court lacked jurisdiction over this matter.

Adkins's motion was denied and a hearing was held on LCCS's motions for permanent custody of both Joshua and James. James, born March, 11, 1991, was initially removed from his mother's home in March 1992. LCCS had removed James for the same basic reasons it had removed Joshua: Adkins's failure to provide an adequate home for the children. LCCS specifically cited Adkins's failure to adequately meet the following basic needs of the children: stable housing, food and nutrition, clothing, hygiene, supervision, and nurturing. On March 26, 1996, nearly six years after Joshua had originally been placed in its temporary custody, LCCS was granted permanent custody of both Joshua and James.

Adkins appeals and raises two assignments of error:

"The trial court erred in determining [that] the agency, Lorain County Children Services, met the requirements of Section 2151.413 and therefore the court did in fact have subject matter jurisdiction to hear the motion for permanent custody of the agency.

"The trial court determination that an order of permanent custody was in the best interest of Joshua Brown and James Keene was against the manifest weight of the evidence specifically where it stated that the parents, particularly Patricia Adkins, had failed continuously and repeatedly for a period of more than six months to substantially remedy the conditions that caused the children to be placed outside the home within the meaning of [R.C. 2151.414(E)(1)]."

Because of the different statuses of the two children, the standing issues raised in the first assignment of error relate only to Joshua. The second assigned error concerns both children.

## I

Adkins claims that the trial court had no "jurisdiction" to entertain the motion for permanent custody because (1) it did not have temporary custody at the time the motion was filed, see R.C. 2151.414, and (2) six months had not elapsed since the order of temporary custody was issued. See R.C. 2151.413.

The issues raised by Adkins do not properly address the "jurisdiction" of the court to entertain the motion. The court clearly had jurisdiction over this matter. See R.C. 2151.23 and 2151.353(E)(1); *Lorain Cty. Children Serv. v. Murray* (Jan. 17, 1996), Lorain App. No. 95CA006053, unreported, at 4, 1996 WL 15843.

The issue is more properly whether LCCS had standing to file a motion upon this state of facts and thus whether the trial court erred in entertaining the motion. For the reasons that follow, we conclude that LCCS had standing to file the motion, and therefore the trial court committed no error.

Despite Adkins's representation to the contrary, LCCS did file its permanent custody motion while it had temporary custody of Joshua. Although LCCS relinquished temporary custody when Joshua was placed in the custody of the Gibsons, the Gibsons later surrendered custody of Joshua to LCCS pursuant to R.C. 5103.15. Temporary custody was reestablished on January 3, 1994, one month before LCCS moved for permanent custody. Therefore, Adkins's reliance on *In re Miller* (1995), 101 Ohio App.3d 199, 655 N.E.2d 252, the specific language of R.C. 2151.414 requiring that the agency currently have custody of the child, is misplaced.

There is no dispute, however, that Joshua had been continuously in the temporary custody of LCCS for less than six months. Therefore, Adkins contends that LCCS had no standing to file the motion because, at the time LCCS filed the permanent custody motion, R.C. 2151.413(A) explicitly provided:

"A public children services agency * * * that * * * is granted temporary custody of a child who is not abandoned or orphaned * * * may file a motion in the court that made the disposition of the child requesting permanent custody of

the child *if a period of at least six months has elapsed since the order of temporary custody was issued* [.]" (Emphasis added.)

The question before us is whether LCCS failed to comply with the requirements of R.C. 2151.413 because the "period of at least six months" following the order of temporary custody did not immediately precede the filing of the permanent custody motion. Based on the facts of this case, we conclude that LCCS had standing to file the permanent custody motion.

The provisions of R.C. Chapter 2151 are to be liberally interpreted and construed so as to effectuate the following purposes:

"(A) To provide for the care, protection, and mental and physical development of children subject to Chapter 2151. of the Revised Code;

"* * *

"(C) To achieve the foregoing purposes, whenever possible, in a family environment, separating the child from its parents only when necessary for his welfare or in the interests of public safety;

"(D) To provide judicial procedures through which Chapter 2151. of the Revised Code is executed and enforced, and in which the parties are assured of a fair hearing, and their constitutional and other legal rights are recognized and enforced." R.C. 2151.01.

Ohio's procedures for terminating parental rights are grounded upon principles of permanency planning which evolved in the late 1970s and culminated in federal legislation, the Adoption Assistance and Child Welfare Act, P.L. 96–272. The guiding principle is that children need and deserve a home where they will develop permanent, strong bonds with parent(s), who will, in turn, provide care, support, discipline, and love. Preference in all cases is for that to take place in the custody of biological parents. The welfare bureaucracy is charged with providing help to families in need of supportive services. But if the natural parent option is not feasible, then the child is to be placed in an adoptive home, where permanence is anticipated. And all of this is to be expedited, so that children will not remain in limbo, or in long-term foster care. See *In re Makuch* (1995), 101 Ohio App.3d 45, 654 N.E.2d 1331, and 13 Milligan, West's Ohio Practice (Supp.1991), Section 501 *et seq.*

The Ohio legislature has struggled to find a balance between the overriding need of children for permanency and the desire for genetic parental custody. Thus, a dependent, neglected, or abused child may be placed on a track toward permanent custody—termination of parental rights—in either of two ways. First, the complainant may request permanent custody in the first instance. In that event both the status of the child and the appropriateness of adoption are considered, without a period of home placement or development of a case plan.

Second, as to a child who has already been found to be dependent, neglected, or abused, under controlled circumstances the agency may move for permanent custody. In event it is not necessary to establish a current status of dependent, neglected, or abused. R.C. 2151.353 and 2151.414. LCCS pursued the second option with Joshua.

Adkins contends that LCCS was required to have temporary custody of Joshua for the six months immediately preceding the filing of the permanent custody motion. In support of this position, she cites *Miller, supra,* which stated in dicta that an agency must wait at least six months to file for permanent custody after reestablishing temporary custody. Because the facts of this case are distinguishable from those of *Miller,* we are unpersuaded by its reasoning.

Adkins's argument is that after Joshua was returned to the temporary custody of LCCS in January 1994, LCCS was required to wait another six months to file for permanent custody. Joshua Brown was removed from his mother's home at the age of six months. At the time LCCS moved for permanent custody, Joshua had been in a state of limbo for nearly four years. To hold that LCCS was required to keep this child's status in a state of uncertainty for another five months would achieve a result that would be not only absurd, but also contrary to all the purposes behind this legislation.

The built-in delay period of R.C. 2151.413, requiring the children services agencies to wait six months before moving for permanent custody, is intended to allow time for the case plan to work. It is clear from the facts before us that LCCS allowed more than adequate time for Adkins to work toward reunification with Joshua.

LCCS originally moved for permanent custody of Joshua in May 1992, at a time when Joshua had been in its temporary custody well in excess of six months. Instead of following through with this motion, however, LCCS allowed Adkins more time to work toward reunification when she returned from Florida. While it is true that LCCS later relinquished temporary custody of Joshua, it was not to allow time for the case plan to work, but to attempt to provide him with a more permanent placement. Unlike the situation in *Miller,* Joshua was never returned to the custody of his mother. The conditions that led to his removal from the home had not been, and never were, remedied. To require an additional six-month delay would only extend Joshua's lack of permanent placement.

Therefore, we find that LCCS had standing to file for permanent custody of Joshua and that the trial court committed no procedural error in granting the motion. The first assignment of error is overruled.

## II

The second assignment of error is that the trial court's finding that Adkins failed, continuously and repeatedly for more than six months, to remedy the situation causing Joshua and James to be placed outside the home was against the manifest weight of the evidence. Adkins relies primarily on the evidence before the trial court concerning her two other children, both born after Joshua and James. Adkins had demonstrated an ability to care for her youngest child, who is in her custody, and was working toward reunification with the other child, currently in the custody of LCCS. Adkins refers to no facts before the trial court, however, to demonstrate her ability to care for Joshua and James.

Although LCCS removed Joshua and James from the home at two different times, Joshua and James were both removed for the same basic problem: Adkins failed to provide them with their basic needs, including an adequate home, nutrition, clothing, hygiene, supervision, and nurturing. Adkins's third child, James III, had been removed from the home primarily due to Adkins's inability to provide adequate attention to his medical problem. LCCS was working with Adkins and hoped that James III would be reunified with his mother. As one caseworker testified, however, Adkins had never demonstrated the ability to care for more than one child at a time. According to the testimony of one caseworker, LCCS did not believe that Adkins had the ability to care for more than two children. Adkins has a low IQ, and had demonstrated to caseworkers that she has difficulty understanding how to care for her children.

Not long after James was removed from the home, Adkins went to Florida without notifying LCCS. She returned to Ohio in the fall and gave birth to James III. Shortly thereafter, she returned to Florida with James III and did not return to Ohio for more than six months. During the many months she was in Florida, Adkins had little contact with Joshua, James, or LCCS. When she returned to Ohio, she attempted to work with LCCS toward a goal of reunification. Although she visited with the children, she made only minimal progress toward reunification. She did not always keep scheduled visitations, and when she did, she did not usually interact appropriately with the children. Adkins's visits with her children were always supervised by LCCS personnel, because LCCS did not feel that Adkins could handle unsupervised visitation. The caseworker testified that there was never a time when she felt that it would be possible to reunify Joshua or James with Adkins.

Adkins's guardian *ad litem* testified that, while Adkins had demonstrated the ability to care for the one child in her custody and was working toward reunification with James III, she did not appear to appreciate the magnitude of reunifying with Joshua and James as well. The guardian *ad litem* believed that Adkins would be overwhelmed and that the situation would be unworkable.

Because the trial court's judgment was supported by credible evidence, we will not disturb it as against the weight of the evidence. *In re Hederson* (1986), 30 Ohio App.3d 187, 190, 30 OBR 329, 332, 507 N.E.2d 418, 420–421.

The second assignment of error is overruled.

*Judgment affirmed.*

DICKINSON, P.J., and SLABY, J., concur.

JOHN R. MILLIGAN, JR., J., retired, of the Fifth Appellate District, sitting by assignment.