DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
 {¶ 1} This case concerns an order terminating parental rights and granting permanent custody of a child, CM., to the Summit County Children Services Board. At the outset, this Court was confronted with a procedural issue stemming from the filing of a purported Anders brief on behalf of the child's mother. See Anders v. California, 386 U.S. 738
(1967). Having previously determined that an Anders brief may be filed in a permanent custody case, this Court has here considered the substance of a proper Anders brief pursuant to the requirements ofAnders v. California, supra, and what may occur when a brief fails to meet those *Page 2 
requirements. On the merits, the child's father, who was incarcerated in Florida at the time of the permanent custody hearing, has asserted that he was erroneously deprived of his due process right to be present at the hearing. He has also asserted that his strong bond with his child should overcome the fact that he was serving a five-year prison sentence and that there was no other family member who could provide care for CM. in the interim. This Court has concluded that an Anders brief must meet certain criteria or it will be stricken and also that due process was not offended when the trial court heard this case in the father's absence. This Court has concluded, in addition, that the trial court did not otherwise err in terminating the parental rights of either parent and in placing CM. in the permanent custody of the agency.
 I. {¶ 2} This Court first considers a procedural issue created by the filing of a brief that failed to meet the requirements set forth by the United States Supreme Court in Anders v. California, 386 U.S. 738
(1967). Following the entry of judgment, the trial court appointed separate counsel to represent each parent on appeal. Counsel for the child's father filed an appellate brief assigning four errors. Counsel for the child's mother filed a brief, purportedly pursuant to Anders v.California, 386 U.S. 738 (1967), in which counsel stated that he had reviewed the record and had concluded that there appeared to be no errors by the trial court prejudicial to the rights of the child's mother. *Page 3 
 {¶ 3} In In re K.D., 9th Dist. No. 06CA0027, 2006-Ohio-4730, at ¶ 18, this Court extended the principles of Anders v. California, 386 U.S. 738
(1967), to cases involving the termination of parental rights. InAnders, the United States Supreme Court indicated that, when court-appointed counsel conducts "a conscientious examination" of the record and concludes that an appeal would be "wholly frivolous," such counsel may so advise the court and request permission to withdraw.Id. at 744. The Supreme Court made it clear, however, that "counsel's bare conclusion" such as would be contained in a no merit letter, is not sufficient. Id. at 742. "Counsel should, and can with honor and without conflict, be of more assistance to his client and to the court."Id. at 744. The Supreme Court indicated that the "constitutional requirement of substantial equality and fair process" requires that counsel fulfill "the role of an active advocate in behalf of his client." Id. Any request to withdraw must be accompanied by a brief with references to the record and legal authorities. Id. at 745. The brief should refer to any matters in the record "that might arguably support the appeal." Id. at 744. A proper Anders brief "serves the dual purpose of assisting the court in determining both that counsel has in fact conducted a review of the record and that the case may be decided without an adversary presentation." State v. Lowe, 9th Dist. No. 97CA006758, 1998 WL 161274, at *1 (Apr. 8, 1998) (citing Penson v.Ohio, 488 U.S. 75, 81, n. 4, (1988), citing Anders,386 U.S. at 744-745)). *Page 4 
 {¶ 4} In this case, the attorney appointed by the trial court to represent the mother filed a document in the court of appeals that failed to include any references to the procedural history of the case or to any of the substantive facts of record. There was no reference to any potential issues or to the law applicable to potential issues. Counsel merely wrote that he had reviewed the file and the transcript of the permanent custody hearing and had come to the unsupported conclusion that "there appears no error by the trial court prejudicial to the rights of Appellant-Mother upon which an assignment of error may be predicated." Anders Brief of Appellant, at 4. Such a "bare conclusion" fails to ensure that the appealing party received the "active advocacy" that Anders sought to protect and to which the mother is entitled, nor does it provide a reviewing court with the assistance it should receive in order to protect the advocacy system inherent to appellate review.See Anders, 386 U.S. at 744.
 {¶ 5} Upon review of the brief filed by the attorney appointed by the trial court, this Court determined that the document failed to fulfill the requirements of Anders, and it was stricken from the record. SeeIn re CM., 9th Dist. Nos. 23606, 23608, 23629, Journal Entry (June 4, 2007). That attorney was removed as the mother's counsel and a new attorney was appointed to represent the mother on appeal. Id. New counsel then filed an appellate brief presenting three errors on behalf of the mother. In re CM., 9th Dist. Nos. 23606, 23608, 23629, Brief of Appellant-Mother (June 14, 2007). *Page 5 
 II. {¶ 6} CM. was born December 24, 1997. At some point, her parents separated. The mother has claimed that the father absconded with the child, while the father has countered that the mother deserted the family. In any event, CM. remained in the custody of her father. In May 2004, six-year-old CM. was living in Florida with her father and his girlfriend, Rhonda Briggs. On or about May 14, 2004, the father was arrested. Eventually, he was sentenced to five years in prison upon convictions for driving with a suspended license, a second degree misdemeanor; possession of drug paraphernalia, a first degree misdemeanor; and willfully fleeing or eluding a police officer, a third degree felony. His projected release date is May 14, 2009, less any time for good behavior.
 {¶ 7} When he was arrested, the father asked Ms. Briggs to care for CM. Ms. Briggs then brought CM. to Ohio to live with her own parents, Maude and Robert Utterback. Within a month, Ms. Briggs was also incarcerated on charges of driving under the influence, possession of methamphetamines, and possession of drug paraphernalia. The Utterbacks then petitioned the juvenile court to obtain custody of CM. The father had apparently consented to the child being placed in the Utterbacks' custody, anticipating that he would reassume custody upon his release from prison. In November 2004, Mrs. Utterback informed Children Services that she was no longer able to care for the child. Thereupon, Children *Page 6 
Services initiated this action on February 4, 2005, based on the fact that the father was incarcerated and the mother's whereabouts were unknown.
 {¶ 8} In its complaint, Children Services alleged that CM. was a dependent and neglected child. CM. was adjudicated dependent on April 29, 2005, and a disposition of temporary custody to Children Services was made on May 9, 2005. The case plan required both parents to obey all laws and court orders, including the father's conditions of probation; participate in drug and alcohol assessments and follow all related recommendations; and complete an anger management or domestic violence class. In addition, the mother was to establish a positive relationship with CM. through visitations.
 {¶ 9} On December 7, 2005, Children Services moved for a six-month extension so that an interstate home study could be conducted concerning a potential relative placement in Virginia. The trial court granted the extension over the objection of the guardian ad litem, who sought immediate permanent custody of the child. On July 12, 2006, the mother moved for another six-month extension in order to comply with her case plan objectives, but the trial court denied that motion.
 {¶ 10} Children Services moved for permanent custody on July 21, 2006, and a hearing on the motion was conducted on January 11, 2007. At the conclusion of the hearing, the trial court found that CM. had been in the *Page 7 
temporary custody of Children Services for 12 or more months of a consecutive 22 month period and that permanent custody was in the best interest of the child.
 {¶ 11} The parents have appealed separately. CM.'s father has presented four assignments of error, and CM.'s mother has presented three assignments of error.
 III. A. {¶ 12} The father's first assignment of error is that the trial court incorrectly denied his motion to be transported from a Florida prison so that he could attend the hearing on the motion for permanent custody. Specifically, the father has contended that he had a due process entitlement to attend the permanent custody hearing and that such right was violated by the trial court's refusal to transport him.
 {¶ 13} On August 24, 2006, the father moved to be transported from the Central Florida Reception Center to Ohio to attend the permanent custody hearing for CM. The trial court denied the motion on September 1, 2007, holding that it lacked jurisdiction to order the father's release from a Florida prison in order to appear at the hearing in Ohio.
 {¶ 14} The United State Supreme Court has determined that parents have a fundamental liberty interest in the care, custody, and management of their children. Santosky v. Kramer, 455 U.S. 745, 753 (1982). Ohio courts have *Page 8 
recognized that parents have a constitutionally protected right to be present at permanent custody hearings, but that this right is not absolute if the parent is incarcerated. See, e.g., In re Smith, 9th Dist. No. 16778, 1995 WL 89455, *2 (Mar. 1, 1995). Rather, in evaluating the due process right of an incarcerated parent to be present at a permanent custody hearing, Ohio courts have looked to the test established by the United States Supreme Court in Mathews v.Eldridge, 424 U.S. 319, 335 (1976). See, e.g., In re Gray, 9th Dist. Nos. 99CA0014 99CA0015, 1999 WL 1260292, *4 (Dec. 22, 1999); In reSprague, 113 Ohio App. 3d 274, 276 (1996). In Mathews, the court recognized that "[D]ue process is flexible and calls for such procedural protections as the particular situation demands," and established a three-part test by which to determine what process may be due in a particular case. Mathews, 424 U.S. at 334-35 (quoting Morrissey v.Brewer, 408 U.S. 471, 481 (1972)). Pursuant to Mathews, the father's due process right to be present at a permanent custody hearing is determined by balancing: (1) the private interest affected; (2) the risk of erroneous deprivation and the probable value of additional safeguards; and (3) the governmental burden of additional procedural requirements.Mathews, 424 U.S. at 335.
 {¶ 15} Regarding the first factor of the Mathews balancing test, the father's fundamental right to raise his child has already been acknowledged. See Santosky, 455 U.S. at 753. The father's parental rights to the care and custody of CM. are "essential" and "basic." SeeStanley v. Illinois, 405 U.S. 645, 651 (1972); In re *Page 9 Murray, 52 Ohio St. 3d 155, 157 (1990). Furthermore, it should be noted that a parent's fundamental liberty interest in the care, custody, and maintenance of his child does not evaporate simply because he has not been a model parent or lost temporary custody of the child to a children's services agency. Santosky, 455 U.S. at 753.
 {¶ 16} Second, the risk of an erroneous deprivation of the father's rights in this case and the probable value of his presence at the hearing was extremely small. An assessment of such risk requires a determination, in practical terms, of the strength of the father's case for the care and custody of CM. See In re Seymore, 9th Dist. No. 98CA007051, 1999 WL 247775, *3 (Apr. 28, 1999).
 {¶ 17} There was evidence that CM. was well-adjusted and that, as the primary care-giver during the child's early years, the father deserves credit for his role in her upbringing. In addition, while in prison, the father participated in several positive programs, and documentary evidence of his participation was received into evidence. According to the Children Services caseworker, the father was extraordinary among his clients in that he regularly wrote appropriate letters to his daughter over the course of two years of imprisonment. CM. was reportedly happy to receive the letters. Furthermore, the father cooperated with Children Services in attempting to locate relatives who might be willing and able to assume custody of the child. *Page 10 
 {¶ 18} Notwithstanding these efforts by the father, it must also be recognized that there was evidence of drug use, transience, and instability on the part of both parents during the time they had custody of CM., and the father was serving a five-year prison sentence for his convictions on three criminal charges with a projected release date of May 14, 2009. See Brief of Appellant-Father, at p. 3. At the time of the permanent custody hearing, when CM was seven and one-half years old, the father had been away from the child for two and one-half years and still had another two and one-half years remaining on his sentence. The trial court found that there was no evidence of any possibility of placing the child with him within a reasonable time, and none of the relatives suggested to the Children Services caseworker were able to assume long-term custody of the child.
 {¶ 19} At the same time, Joe Gero, the Children Services caseworker, testified that CM. had been placed with a foster family for nearly two years and that she had bonded with the family. Gero stated that the child has an "excellent relationship" with both parents, interacts comfortably with them, and calls them mom and dad. The child, he testified, is very well adjusted and has not presented any of the behavioral problems typically seen in these cases. The caseworker, counselor, and guardian ad litem all expressed the belief that adoption is in CM.'s best interest. If permanent custody is granted to the agency, the current foster parents reportedly wish to adopt the child. *Page 11 
 {¶ 20} Pursuant to the third factor of the Mathews test, the government has an interest in resolving this matter in an expedited manner. Further delay in arriving at a determination of permanent custody would not be in the best interests of this young child who had already been in the temporary custody of Children Services for two years at the time of the hearing. See, e.g., In re Seymore, 9th Dist. No. 98CA007051, 1999 WL 247775, *3 (Apr. 28, 1999). The government also had a cognizable interest in reducing the cost, administrative burdens, and safety burdens involved in transporting the father from the Florida prison to Ohio and back. See id.
 {¶ 21} The father has argued that his absence from the hearing resulted in him being "unable to convey relevant and probative information to the trial court concerning the relationship and the interaction between himself and 1) the mother; 2) their daughter; and 3) various relatives including, but not limited to, his sister, his step-brother and his mother." Brief of Appellant-Father, at p. 11. There is no argument, however, that this evidence could not have been presented by deposition or by calling the relatives as witnesses. It did not require the father's presence.
 {¶ 22} Finally, the father has argued that the trial court should have followed the procedure utilized by the Eleventh District Court of Appeals in In re Maciulewicz, 11th Dist. No. 2002-A-0046, 2002-Ohio-4820. In that case, the trial court granted the incarcerated parent's motion to transport and instructed the *Page 12 
sheriff's department to contact the Pennsylvania authorities to determine whether they would release the inmate to the custody of the sheriff's department for transport to Ohio so the inmate could attend the permanent custody hearing. The court further held, however, that if the Pennsylvania authorities indicated that they would not release the inmate, then the obligation of the sheriff's department to transport would be void. As it turned out, the Pennsylvania authorities refused to release the inmate. A subsequent motion for telephone participation was also denied.
 {¶ 23} The father has contended that if the trial court followed theMaciulewicz procedure, then the Florida prison authorities "may have honored" such an order. The father's argument on this point is speculative, as there is no basis on which to conclude that this procedure would have resulted in the father being transported to Ohio any more than it resulted in the parent being transported inMaciulewicz. The father has not provided this Court with citation to any case in which a parent was transported across state lines for a permanent custody hearing. See State v. Davis, 38 Ohio St. 3d 361, 364, n. 7, (1988) (holding that a speculative argument is insufficient to prove prejudice); United States v. Marion, 404 U.S. 307, 326 (1971) (concluding that possibilities are not enough to establish prejudice).
 {¶ 24} In sum, it is unlikely that anything the father may have presented by way of testimony regarding his relationship with the child would have militated *Page 13 
against giving Children Services permanent custody. The risk of transport, assuming it would be possible under the circumstances, along with the fact that the father was represented by counsel and could have presented the testimony sought by deposition or by calling other witnesses outweighs this father's interest in being present at the hearing. Indeed, this Court and other appellate districts have specifically held that an incarcerated parent's right to due process is not violated when the parent is represented by counsel at the hearing, a full record of the proceedings is made, and any testimony that the parent may wish to present could be offered by way of deposition. See, e.g., In re Frasher, 9th Dist. No. 18100, 1997 WL 537666, *2 (Aug. 20, 1997); In re Smith, 9th Dist. No. 16778, 1995 WL 89455, *2 (Mar. 1, 1995); In re Harding, 9th Dist. No. 16552, 1995 WL 28993, *3 (Jan. 25, 1995).
 {¶ 25} The governmental burden, together with the slight risk of erroneous deprivation, outweigh the father's interest in personally appearing at the permanent custody hearing. The Court concludes that the father's due process rights were not violated when the trial court conducted the permanent custody hearing in his absence. The father's first assignment of error is overruled.
 B. {¶ 26} The father's second assignment of error is that he was denied effective assistance of trial counsel because his attorney (1) did not "properly petition" the trial court to exercise its jurisdiction to order that the father be *Page 14 
transported from Florida to Ohio; (2) did not seek an order from the Florida authorities to allow the father to be transported to Ohio; (3) failed to utilize alternative means by which the father could participate in the proceedings, such as telephone conferencing or the use of depositions or affidavits; and (4) did not call any witnesses on his behalf, who could have attested to his "bond, commitment and love for his daughter." As a result, the father has claimed that he was unable to convey relevant and probative information to the trial court concerning his relationship with his daughter and the interactions among persons involved in the child's life.
 {¶ 27} The test for ineffective assistance of counsel used in criminal cases is equally applicable to actions seeking to force the permanent termination of parental rights. In re Heston, 129 Ohio App. 3d 825, 827
(1998). That two-part test requires a demonstration that counsel's performance fell below an objective standard of reasonable representation and that the client has suffered prejudice. State v.Bradley, 42 Ohio St. 3d 136, paragraph two of the syllabus (1989). The father has argued that, by his trial counsel's failure to secure the father's presence or participation at the permanent custody hearing, counsel's representation fell below an objective standard of reasonable representation and that the father was thereby prejudiced.
 {¶ 28} This Court has concluded that counsel's performance did not fall below an objective standard of reasonable representation in connection with the *Page 15 
failure to transport the father from Florida. State v. Bradley,42 Ohio St. 3d 136, paragraph two of the syllabus (1989). Further, this Court has concluded that the father has failed to demonstrate prejudice because additional evidence regarding his excellent relationship with his daughter would not have led to a different outcome.Bradley, 42 Ohio St.3d 136, at paragraph three of the syllabus. There was already more than adequate evidence of that relationship before the trial court.
 {¶ 29} This Court has previously considered a similar case in which a parent argued that his counsel was ineffective for failing to request a continuance or depose the parent prior to the hearing. In reSeymore, 9th Dist. No. 98CA007051, 1999 WL 247775, *3 (Apr. 28, 1999). In that case, this Court determined that it was unlikely that anything the parent may have presented by way of testimony would have altered the result because the child had been in foster care for nearly two years at the time of the permanent custody hearing and there was a long sentence yet to be served by the parent. The Court held that the trial court was justified in finding that it was in the child's best interest to be placed in the permanent custody of the agency and that the child could not be placed with a parent within a reasonable time. Id The Court reasoned that the parent had failed to demonstrate that he was prejudiced by his trial counsel's failure to request a continuance or, in the alternative, to depose him prior to the hearing. See, also,In re Leo D., 6th Dist. No. L-01-1452, 2002-Ohio-1174. *Page 16 
 {¶ 30} Similarly, in this case, this Court concludes that it is unlikely that the father could have presented any testimony that would have militated against giving Children Services permanent custody of CM. She had been in foster care for two and one-half years at the time of the permanent custody hearing, and the father had two and one-half years remaining on his sentence. There was evidence before the trial court, through the Children Services caseworker, that the father deserved credit for his role in raising a well-adjusted little girl before his incarceration and for attempting to find relatives who could assume custody of the child. There was also evidence before the trial court that the father had made efforts to turn his life around while in prison and that he was communicating regularly through appropriate letters with CM. The trial court recognized this evidence when it concluded that there was a bond between CM. and her father, and that the father is "deeply devoted" to his daughter. Nevertheless, the trial court was also forced to conclude that the father's sentence prevented him from providing a legally secure placement for his daughter and that permanent custody was the only option to provide for her care. The trial court also found that the mother had no relationship or bond with her daughter and lacked the dedication to re-establish a relationship with her.
 {¶ 31} The father has provided only speculative arguments regarding what his testimony may have been, as well as a mere suggestion that the outcome of the trial would have been otherwise had he testified. Consequently, he has not *Page 17 
established that his counsel's actions constituted ineffective assistance of trial counsel. His second assignment of error is overruled.
 C. {¶ 32} The father's third assignment of error is that the award of permanent custody to Children Services is against the manifest weight of the evidence. Before a juvenile court can terminate parental rights and award permanent custody of a child to a proper moving agency, it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned, orphaned, has been in the temporary custody of the agency for at least 12 months of the prior 22 months, or that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, based on an analysis under Section 2151.41.4(E) of the Ohio Revised Code; and (2) that the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under Section 2151.41.4(D) of the Ohio Revised Code. See R.C. 2151.41.4(B)(1) and 2151.41.4(B)(2); see, also, In re William S., 75 Ohio St. 3d 95, 97-99 (1996).
 {¶ 33} The trial court found that the first prong of the permanent custody test was satisfied because CM. had been in the temporary custody of Children Services for at least 12 of the prior 22 months. The child's father has not challenged that finding. He has challenged only the trial court's determination that the second prong was satisfied. *Page 18 
 {¶ 34} In State v. Wilson, 113 Ohio St. 3d 382, 2007-Ohio-2202, at ¶ 24, the Ohio Supreme Court held that an appellate court may not reverse a trial court's judgment in a civil case if that judgment is supported by "some competent, credible evidence going to all the essential elements of the case." When, as in this case, the trial court's judgment was in favor of the party with the burden of proof, this Court must affirm that judgment if it is supported by evidence that, if believed, would satisfy the burden of proof. Id. at ¶ 26.
 {¶ 35} When determining whether a grant of permanent custody is in the child's best interest, pursuant to the second prong of the permanent custody test, the juvenile court must consider: (1) the child's personal interactions and relationships; (2) the child's wishes regarding placement; (3) the custodial history of the child; (4) whether there are appropriate alternatives to permanent custody, and (5) whether any of the factors in R.C. 2151.41.4(E)(7) to (11) apply. R.C. 2151.41.4(D). Although the trial court is not precluded from considering other relevant factors, the statute explicitly requires the court to consider all of the enumerated factors. See In re Smith, 9th Dist. No. 20711, 2002-Ohio-34; see, also, In re Palladino, 11th Dist. No. 2002-G-2445, 2002-Ohio-5606, at ¶ 24.
 {¶ 36} That permanent custody is in the best interest of the child must be established by clear and convincing evidence. Clear and convincing evidence is that which will produce in the trier of fact "`a firm belief or conviction as to the facts sought to be established.'"In re Adoption of Holcomb, 18 Ohio St. 3d 361, *Page 19 
368 (1985) (quoting Cross v. Ledford, 161 Ohio St. 469, paragraph three of the syllabus (1954)).
 {¶ 37} The first best interest factor calls for consideration of the existing relationships and interrelationships of the child. See R.C. 2151.41.4(D)(1). There was evidence before the trial court that the father had been CM.'s primary caregiver during her early years and that he shared a strong bond with her. There was also evidence that the father demonstrated an exceptional commitment to writing letters to her, sending her a letter every two weeks for two years. Caseworker Gero testified that the father was interested in the care and welfare of his daughter and had complied with Children Service's case plan directed requests of him. Still, by the time of the father's anticipated release from prison, their relationship will have been relegated to letters or telephone calls for at least five years.
 {¶ 38} The trial court found that the father and daughter shared a bond and that the father was "deeply devoted" to his daughter. The trial court further noted that the father had written to his daughter consistently and has been "steadfast" in his inquiries regarding her well-being and attempts to locate relatives to provide for her care. The court concluded that, notwithstanding the father's best efforts, he is unable to have direct interaction with his daughter or provide for her care because he is serving a five-year prison term in Florida. *Page 20 
 {¶ 39} As to the mother, there was testimony before the trial court from both the Children Services caseworker and the guardian ad litem that CM. had little memory of her mother. The evidence revealed that the mother had moved back to the area during these proceedings, staying in a homeless shelter, in order to attempt to re-establish a relationship with her daughter, but, according to the trial court, she "did not have the dedication to remain in Ohio to establish a relationship or complete her case plan." The mother's participation in this case extends to only one hearing. She arrived in March 2006. In June 2006, when she was unable to immediately participate in visitation with CM. due to the recommendations of the child's therapist, she left Ohio to stay with relatives, first in Virginia and then in Florida. Whatever may be made of the therapist's hesitancy to allow the long-absent mother to attempt to re-establish a relationship with her child, the mother did not leave valid contact information with Children Services and, even more noteworthy, failed to initiate any further contact of her own with the agency or her attorney once she left Ohio. In essence, she abandoned all efforts to reunite with her child.
 {¶ 40} When the mother appeared at the March 2006 hearing, she testified that she last saw CM. in 2003. She claimed that, at that time, the father "absconded" with CM. She also testified to a lengthy history of drug-related convictions in several states and that she had given an older child to her own parents in 1990 because of a drug problem. The mother explained that she had *Page 21 
come late to these proceedings because the father had failed to notify her of the existence of the action. Despite her assurances that she would send an address when she got settled, she never did. The trial court concluded that the mother has no relationship or bond with her daughter.
 {¶ 41} As to other relatives, the father proposed three relatives for temporary placement. The father's sister from Virginia initially sought placement, but eventually lost interest. The father's step uncle and the step uncle's wife from California sought to intervene, despite the fact that they had never met the child, but were forced to withdraw their request based on the needs of their own family. And the father's own mother — from Texas — contacted Children Services in October 2006 after Children Services had moved for permanent custody. She had apparently waited because she preferred that her son obtain custody. Due to her late involvement, Children Services suggested she contact her local children services agency to become a certified adoption home. The record contains no further information on any efforts by the paternal grandmother.
 {¶ 42} The guardian ad litem and caseworker explained that CM. was well adjusted and thriving in her foster placement. By the time of the permanent custody hearing, she had lived with the foster parents for two years and called them mom and dad. If permanent custody were to be awarded to the agency, they would be interested in adopting CM. *Page 22 
 {¶ 43} As to the second best interest factor, Linda Sells, the guardian ad litem, reported that CM. had expressed her desire to remain in her foster home. Ms. Sells also expressed her belief that permanent custody was in the best interests of CM.
 {¶ 44} The father has urged that the opinion of the guardian ad litem should carry little weight. He points out that, while she acknowledged the strong bond between the father and daughter, she focused on the fact that the child was doing well in foster care and recommended that permanent custody be awarded to Children Services. The father has asserted that the guardian ad litem was inordinately predisposed toward adoption by the foster care providers as opposed to re-unification with him. For example, in January 2006, she opposed Children Service's motion for a six-month extension of temporary custody and sought the immediate initiation of permanent custody proceedings. In March 2006, she objected to the case plan, asserting that permanent custody, and not reunification, was in the minor child's best interest.
 {¶ 45} In support of the father's position that the child should be returned to his custody, the father points to the testimony of caseworker Gero, who stated that the child was very well adjusted in the foster home and has not had any of the problems typically seen in children that come into care. Gero credited the father, as CM.'s early caregiver, with contributing to a well-adjusted child. *Page 23 
 {¶ 46} Third, the custodial history of the child reflects that CM.'s first three years were spent with her mother and father. Then, according to the mother, the child's father absconded with the child, while the father suggests that the mother deserted them. In May 2004, the father was arrested, and he left the child with his girlfriend, who, in turn, left the child with her parents when she was arrested. By January 2005, CM. was in the custody of Children Services and was eventually placed with a foster family where she has remained. The father has argued that the fact that the child is well-adjusted indicates that there has been no detrimental impact from his care of the child.
 {¶ 47} Fourth, there was evidence before the trial court that supported its conclusion that CM.'s need for a secure permanent placement could only be met by a grant of permanent custody to the agency. Caseworker Gero testified that CM. deserves a permanent placement and that it was in her best interest to be placed in the permanent custody of Children Services. He stated that neither parent had demonstrated the ability to provide the stability and security of a safe environment, and no suitable relatives were willing to assume legal custody. The guardian ad litem also stated her belief that permanent custody was in the best interest of the child.
 {¶ 48} The father has contended that there is no evidence that the child is in need of a legally secure placement. Instead, he has asserted that if the mother had been afforded a fair opportunity to comply with her case plan, especially the *Page 24 
visitation component, then she could have demonstrated her ability to provide a legally secure environment and been available to care for the child on a permanent basis. He has argued that the trial court should have granted the mother's request for legal custody as a less drastic alternative to permanently severing the family relationship, or should have alternatively granted a six-month extension to give the mother additional time to reunify with the child. Even assuming the father may assert the mother's right to custody of the child, the mother had virtually no previous relationship with the child, had no ability to support the child, and made no attempt to pursue a relationship after she left town.
 {¶ 49} The father concedes that the length of his incarceration and the mother's abandonment of the child may be relevant factors in this case. Nevertheless, he has asserted that the sum of the evidence establishes that he has a healthy and significant relationship with his daughter, as well as a strong commitment to her. He contends that he has made efforts to remedy the circumstances that led to her removal and has substantially complied with the case plan objectives.
 {¶ 50} The judgment of the trial court, finding that the best interest of the child was to be placed in the permanent custody of Children Services, was supported by competent, credible evidence. There are often no good results in these cases, but only the best that may be made of a difficult situation. *Page 25 
Sometimes, the opportunity for permanence and stability must control. As this
Court has previously written:
 In determining the best interest of the child, there must be a point of finality where a child can no longer be kept in an uncertain environment for an indeterminable amount of time. A child must be given the opportunity to find permanence and stability.
In re Frasher, 9th Dist. No. 18100, 1997 WL 537666, *2 (Aug. 20, 1997) (citing In re Swisher, 9th Dist. No. 17879, 1997 WL 164311, *3 (Apr. 2, 1997), and Lorain Cty. Children Serv. v. Keene, 118 Ohio App. 3d 535,539 (Mar. 17, 1997)). The father's third assignment of error is overruled.
 D. {¶ 51} The father's fourth assignment of error is that he was prejudiced by the trial court's failure to grant the mother's motion for a six-month extension and the trial court's finding that Children Services made reasonable efforts to reunite the family. He has, however, made no argument in support of the claimed error. Instead, he has asked this Court to recognize the potential prejudice to his residual parental rights if the Court finds any error in the mother's case.
 {¶ 52} This Court is obligated to only consider errors that have been separately argued. App. R. 12(A)(2); App. R. 16(A). Furthermore, as is discussed below, the Court has found no merit in the mother's assigned errors that might impact the father's residual parental rights. The father's fourth assignment of error is overruled. *Page 26 
 E. {¶ 53} Before considering the errors specifically assigned by the mother, the Court notes that her attorney included the following in his appellate brief: "Initially, this Appellant hereby incorporates the arguments and assignments of error in the father-Appellant's brief as if re-written herein." This attempt to include additional arguments and assignments of error is ineffective. Rule 16 of the Ohio Rules of Appellate Procedure, describing the content and requirements of an appellant's brief, does not contemplate the general incorporation by reference of another party's assigned errors and arguments. Pursuant to Rule 12(A)(2) of the Ohio Rules of Appellate Procedure, this Court is only obligated to consider errors separately argued. Rule 7(B) of the Local Rules of the Ninth Appellate District "clearly requires that an appellant argue his case before this court in the brief, rather than simply refer the court elsewhere." Western Reserve Logistics v. HuntMach. Mfg. Co., 9th Dist. No. 23124, 2006-Ohio-5070, at ¶ 12 (citingCardone v. Cardone, 9th Dist. No. 18349, at 10, 1998 WL 224934 (May 6, 1998)). Consequently, the Court will proceed to consider the errors specifically assigned by the mother.
 {¶ 54} The mother's first assignment of error is that the trial court's finding with respect to the best interest of the child is against the weight of the evidence. In support of her claim, she has pointed to evidence of the child's bond with her father, the fact that the child appears to be well-adjusted, and the question of the *Page 27 
child's need for a permanent placement. Evidence on these points has been considered above in regard to the best interest argument raised by the father. The argument does not take on any greater importance in regard to the mother.
 {¶ 55} The mother has also argued that Children's Services interfered with the case plan by cutting off all contact between the mother and child and that the child's therapist never met with the mother when the agency would not permit contact with the child absent such meeting. The therapist's apparent lack of effort toward reuniting CM. with her mother is distressing.
 {¶ 56} It should be noted, however, that the mother and father separated when the child was very young and the child resided solely with the father. CM. has little memory of her mother. The child's mother returned to the Akron area only in March 2006 and sought to renew her relationship with her child. Following a hearing before the magistrate, the magistrate wrote in her order that the guardian ad litem "strongly objected" to any introduction of CM. to her mother until it can be done with the assistance of a therapist. The Magistrate expressed her agreement with that reasoning, and favored an approach of re-introducing CM. to her mother "in as positive a fashion as possible." The Magistrate's Order was as follows:
 Children Services Board shall secure counseling for [CM.] immediately in order to reintroduce [CM.] to her mother, evaluate any contact between [CM.] and her mother, and assist [CM.] in her emotional adjustment to the re-acquaintance. *Page 28 
 Mother may continue to correspond with [CM.] on a schedule of no more than one letter weekly, and under the guidelines of Children Services Board as to appropriateness. Children Services Board shall have the discretion as to whether to forward those letters to [CM.] pending the therapist's involvement. Once a therapist becomes involved, the therapist shall exercise the discretion as to whether [CM.] should receive correspondence from the mother. Correspondence to [CM.] from either parent shall be discoverable by all other parties.
 {¶ 57} CM. began counseling, and the therapist believed that the child should not be reintroduced to her mother until she had several sessions with the child. By June, the mother, who had been staying in a homeless shelter while she was in town, decided to leave to go to Virginia and then to Florida where she had family support. She left telephone numbers with Children Services, but those numbers were apparently invalid. The mother assured Children Services that she would send an address when she was settled, but never did. In addition, the mother never made any telephone calls or sent any letters to the court or the agency to follow up on the progress of her daughter. Indeed, appellate counsel has not been able to reach his client. Notwithstanding the troubling failure of the therapist to conduct some sort of meeting between the child and her mother, this Court is constrained to conclude that the mother's virtually complete failure to demonstrate a commitment to her daughter earlier in her life as well as after she left town, obviates any prejudice by the therapist's delay. *Page 29 
 F. {¶ 58} The mother's second assignment of error is a challenge to the constitutionality of Section 2151.41.4(B)(1)(d) of the Ohio Revised Code, the so-called "12 of 22" provision. She has argued that it violates due process because it eliminates any requirement that the state establish parental unfitness before terminating parental rights.
 {¶ 59} This Court will not reach the merits of this challenge, however, because the mother has raised it for the first time on appeal. There is nothing in the record to indicate that the mother raised this constitutional issue at the permanent custody hearing or anytime prior to the trial court's ruling on the permanent custody issue. Generally, an appellate court will not consider a claimed error that could have been, but was not, called to the trial court's attention at a time when it could have been avoided or corrected by the trial court. State v.Childs, 14 Ohio St. 2d 56, paragraph three of the syllabus (1968). The "[f]ailure to raise at the trial court level the issue of the constitutionality of a statute or its application, which issue is apparent at the time of trial, constitutes a waiver of such issue and a deviation from this state's orderly procedure, and therefore need not be heard for the first time on appeal." State v. Awan, 22 Ohio St. 3d 120, syllabus, (1986). See, e.g., In re CF., 9th Dist. No. 02CA008084, 2002-Ohio-6113, at ¶ 37-38. The mother's second assignment of error is overruled. *Page 30 
 G. {¶ 60} Finally, the mother has argued that she received ineffective assistance of trial counsel. She has asserted that her attorney: (1) failed to seek out and call any witnesses on her behalf, in particular the child's therapist who could verify that Children Services interfered with her visitation rights; (2) failed to seek an order of contempt against Children Services and its employees for their refusal to permit the mother to visit with her child; and (3) failed to object to objectionable evidence, such as the caseworker's testimony that some family members believed the mother "probably abused drugs" and that she lived a transient lifestyle.
 {¶ 61} As to the first and second point, trial counsel should have pursued visitation by the mother more vigorously, but any error in this regard must be deemed harmless in light of her subsequent failure to maintain any contact with the court or Children Services. The telephone numbers she left were not valid and she never provided an address.
 {¶ 62} As to the third point, any failure to object to testimony that the mother may have abused drugs was harmless. The mother testified at a hearing before the magistrate that she had a history of drug-related convictions beginning with cocaine possession in 1989, a phencyclidine charge in 1990, and an October 2005 conviction for possession of Xanax. The mother also admitted that she abandoned an older daughter to grandparents in 1990 when she fled to avoid drug *Page 31 
prosecutions. Following this March 2006 hearing, the magistrate specifically found that the mother has a "history of fleeing the law, drug abuse and transience." The mother did not object to the magistrate's findings. The mother's third assignment of error is overruled.
 IV. {¶ 63} Both the father's and mother's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30. *Page 32 
Costs taxed to appellant.
SLABY, P.J. BAIRD, J. CONCUR
(Baird, J., retired, of the Ninth District Court of Appeals, sitting by assignment pursuant to, § 6(C), Article IV, Constitution.) *Page 1