[Cite as *In re A.H.*, 2025-Ohio-2758.]

STATE OF OHIO          )             IN THE COURT OF APPEALS
                            )ss:         NINTH JUDICIAL DISTRICT
COUNTY OF SUMMIT    )

IN RE: R.L.
       A.H.

C.A. Nos.    31235
                  31242
                  31243
                  31244


APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE Nos.    DN 22 04 0408
                  DN 22 04 0409

DECISION AND JOURNAL ENTRY

Dated: August 6, 2025

---

STEVENSON, Presiding Judge.

{¶1} Appellants Mother, Father B., and Father L. appeal the judgment of the Summit County Court of Common Pleas, Juvenile Division, that terminated their parental rights and placed their children in the permanent custody of Summit County Children Services Board ("CSB" or "the agency"). Because the evidence supports the juvenile court's judgment, and Father L. has not demonstrated that his trial counsel was ineffective, this Court affirms.

I.

{¶2} Mother is the biological mother of A.H., born January 26, 2013; and R.L., born September 11, 2015. Father B. is A.H.'s biological father, while Father L. is the biological father of R.L. The children lived with Mother and Father L. in North Carolina for about three years until Mother returned to Ohio with the children around 2018. Father L. remained in North Carolina. In

2019, CSB removed the siblings from Mother's home based on an incident involving a lack of parental supervision. Mother was ultimately convicted of child endangering based on the incident. The juvenile court adjudicated A.H. and R.L. neglected and dependent children. North Carolina completed an Interstate Compact for the Placement of Children ("ICPC") assessment of Father L. but found his home unsuitable and denied placement with him. In April 2021, the juvenile court returned the children to Mother's legal custody.

{¶3} One year later, in April 2022, Mother's lack of parental supervision again played a key role in CSB's second removal of the children from her home. The agency filed complaints alleging that A.H. and R.L. were abused, neglected, and dependent children. CSB alleged the following: Mother and the children were living with three maternal uncles, all of whom had criminal histories. One of the uncles was sexually abusing then nine-year-old A.H. Both Mother and then six-year-old R.L. were aware of the sexual abuse, but only R.L. attempted to stop it. The home was infested with roaches. Mother had an outstanding warrant on a charge of felony theft.

{¶4} Mother waived her right to an adjudicatory hearing and stipulated that both children were abused, neglected, and dependent as the agency alleged. Father L. appeared for the adjudication of R.L., and CSB presented evidence regarding that child. Father B. did not appear for the adjudication of A.H., and CSB presented evidence regarding that child. The juvenile court adjudicated A.H. and R.L. abused, neglected, and dependent children.

{¶5} By the time of the initial dispositional hearing, Mother had been arrested on her outstanding warrant and was incarcerated at Oriana House, a community corrections facility. Mother and Father L. appeared for the hearing, while Father B. did not. The juvenile court placed the children in CSB's temporary custody and adopted the agency's case plan as an order. The case plan required Mother to obtain a mental health assessment, participate in parenting education,

submit a housing referral application, make a plan for appropriate supervision of the children, and demonstrate that she can meet the family's basic needs. The case plan ordered Father L. to cooperate in relation to an ICPC assessment with CSB and the child welfare agency in North Carolina where he continued to reside, follow recommendations arising from the assessment, identify family members for possible placement of R.L., and sign all requested releases of information. Father B. was directed to contact CSB if he was interested in pursuing visitation or legal custody of A.H.

{¶6} As the case progressed, North Carolina denied Father L. for placement, so he relocated to Ohio. Mother remained incarcerated, transferring from various community based correctional facilities to others. Father B. requested visitation with A.H., but he declined to follow up further. Based solely on Mother's involvement in services while incarcerated, CSB moved for a first six-month extension of temporary custody. The juvenile court granted the extension after a hearing.

{¶7} With Father L. living in Ohio and Father B. expressing an interest in pursuing a relationship with A.H., CSB amended the case plan to add requirements for both fathers. The case plan, which the juvenile court adopted, required Father L. to maintain a safe home, demonstrate his ability to provide for R.L.'s basic needs, obtain a mental health assessment and follow all recommendations, execute releases of information, and follow the recommendations arising from his recent ICPC assessment or from his treatment providers. Father B.'s objectives included demonstrating his ability to meet the basic needs of A.H., cooperating with the agency regarding a background check, submitting to random drug screens, resolving his criminal cases, and executing releases of information.

{¶8} Mother was released from incarceration and placed on probation. She and Father L. began visiting regularly with the children but otherwise were not participating in case plan services. Father B. was arrested for various crimes, later convicted, and sentenced to multiple years in prison.

{¶9} Eighteen months into the cases, CSB moved for permanent custody, amending its motion twice. During that time, Father L.'s attorney moved to withdraw from further representation, asserting that communications between him and Father L. had broken down, and that Father L. had become hostile and uncooperative. The juvenile court allowed counsel to withdraw and appointed a new attorney for Father L.

{¶10} Father L.'s new counsel moved to continue the permanent custody hearing to allow her time to review the record and file a Civ.R. 60(B) motion she deemed appropriate. The juvenile court granted the continuance.

{¶11} On March 30, 2024, Father L. moved: (1) to remove and replace the assigned CSB caseworker and caseworker's supervisor; (2) for legal custody of R.L. to Father L., alternatively legal custody to Mother, or alternatively shared legal custody of R.L. to Mother and Father; and (3) to vacate pursuant to Civ.R. 60(B)(2)/(5) "Journal Entries of the Proceedings After January 22nd, 2023[.]" In his motion to vacate, Father L. alleged newly discovered evidence that CSB had "manipulated" his case "into failure" by delivering incomplete records to the guardian ad litem. In addition, he questioned whether he had received competent representation by his prior attorney who had failed to file anything or enlist the aid of the guardian ad litem to address Father L.'s accusations of sex trafficking by CSB and the foster parents' abuse of R.L. While acknowledging Father L.'s challenging mental health and personality issues, his current counsel asserted that a competent attorney could have controlled Father L. with "sufficient effort in coaching and

communication." Three weeks later, this attorney too moved to withdraw, citing Father L.'s "intrusive thoughts concerning the child welfare system[,]" intermittent grasp of facts, and accusations that counsel was a criminal and child trafficker as reasons why she and Father L. no longer had a functional attorney-client relationship. Counsel additionally moved for appointment of both a new attorney and a guardian ad litem for Father L. The juvenile court ordered those appointments.

{¶12} CSB objected to Father L.'s motions to remove and replace its caseworker and supervisor and to vacate prior journal entries. The agency declined to comment on the prior attorney's effectiveness but asserted that that did not constitute newly discovered evidence to support a Civ.R. 60(B) motion. The juvenile court summarily denied Father L.'s motions to vacate journal entries and to remove the caseworker and supervisor from the cases without any analysis. Father L. did not attempt to appeal the denial of his Civ.R. 60(B) motion.

{¶13} Father L. moved for additional visitation and requested unsupervised visits. CSB opposed unsupervised visits, asserting that Father L. had not engaged in mental health or parenting services and that some visits at the family enrichment center had been problematic due to Father L.'s anger issues and his terminating visits early. The agency did not oppose increasing supervised visits between Father L. and R.L. The juvenile court ordered that the agency may lengthen or reduce Father L.'s visits in accord with its visitation program after consultation with the guardian ad litem.

{¶14} The guardian ad litem moved for appointment of an attorney for the children because both had expressed a desire to return to Mother's legal custody. The trial court appointed counsel for the children, but the attorney moved to withdraw as to R.L. after that child could not articulate his wishes regarding custody. A.H.'s attorney moved for legal custody to Mother on

behalf of A.H. In the meantime, CSB filed a notice that the agency had placed A.H. in a residential treatment facility based on the child's mental health issues and behavioral concerns.

{¶15} Almost two and a half years after CSB filed its complaints, the juvenile court held a two-day permanent custody hearing. The guardian ad litem had filed her report shortly before the hearing, recommending permanent custody as to A.H., but guardedly recommending placing R.L. in Father L.'s legal custody. After hearing the testimony of witnesses and other evidence, however, the guardian ad litem withdrew her recommendation for legal custody of R.L. to Father L. and opined that an award of permanent custody would be in both children's best interest. The juvenile court granted CSB's motion for permanent custody and terminated Mother's, Father L.'s, and Father B.'s parental rights. All three parents appealed, filing a total of seven assignments of error for review. This Court consolidates some assignments of error to facilitate review.

II.

**Custodial disposition of A.H.**

### MOTHER'S ASSIGNMENT OF ERROR I

THE TRIAL COURT ERRED AS A MATTER OF LAW BECAUSE [CSB] FAILED TO ESTABLISH ON THE RECORD SUFFICIENT EVIDENCE TO TERMINATE [MOTHER'S] PARENTAL RIGHTS.

### MOTHER'S ASSIGNMENT OF ERROR II

THE TRIAL COURT'S TERMINATION OF [MOTHER'S] PARENTAL RIGHTS WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

### FATHER B.'S ASSIGNMENT OF ERROR

THE TRIAL COURT ABUSED ITS DISCRETION IN ITS GRANT OF PERMANENT CUSTODY TO [CSB], AND THE DECISION OF THE TRIAL COURT TO TERMINATE THE PARENTS' RIGHTS WAS NOT SUPPORTED BY CLEAR AND CONVINCING EVIDENCE AND WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶16} Mother and Father B. argue that the juvenile court's award of permanent custody of A.H. to CSB is not supported by sufficient evidence and is against the manifest weight of the evidence. This Court disagrees.

{¶17} This Court recognizes the distinction between sufficiency and manifest weight within the context of a permanent custody determination. "Sufficiency and weight of the evidence are both quantitatively and qualitatively distinct." *In re D.J.*, 2024-Ohio-1876, ¶ 19 (9th Dist.), citing *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 23. "'[S]ufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a [judgment] is a question of law.'" *In re D.J.* at ¶ 19 (9th Dist.), quoting *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).

{¶18} In determining whether the juvenile court's judgment is against the manifest weight of the evidence, this Court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new [hearing] ordered." (Internal quotations and citations omitted.) *Eastley* at ¶ 20. When weighing the evidence, this Court "must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21.

{¶19} Before a juvenile court may terminate parental rights and award permanent custody of a child to a proper moving agency, it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned; orphaned; has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; the child or another child of the same parent has been adjudicated abused, neglected, or dependent three times; or that the child cannot be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of the child, based on

an analysis under R.C. 2151.414(D)(1). R.C. 2151.414(B)(1) and 2151.414(B)(2); *see also In re William S.*, 75 Ohio St.3d 95, 98-99 (1996).

{¶20} The best interest factors include: the interaction and interrelationships of the child, the wishes of the child, the custodial history of the child, the child's need for permanence and whether that can be achieved without a grant of permanent custody, and whether any of the factors outlined in R.C. 2151.414(E)(7)-(11) apply. R.C. 2151.414(D)(1)(a)-(e); *see In re R.G.*, 2009-Ohio-6284, ¶ 11 (9th Dist.). Clear and convincing evidence is that which will "produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." (Internal quotations omitted.) *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 368 (1985), quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶21} As its first prong grounds, CSB alleged that A.H. had been in the agency's temporary custody in excess of 12 months of a consecutive 22-month period under R.C. 2151.414(B)(1)(d); and, alternatively, that A.H. could not or should not be placed with either parent under R.C. 2151.414(B)(1)(a), based on various subsection (E) grounds. The juvenile court found that CSB met its first prong burden by proving by clear and convincing evidence its 12 of 22 allegation. Mother and Father B. do not challenge that finding and the evidence supports it. Accordingly, this Court reviews only the juvenile court's determination that an award of permanent custody is in the best interest of A.H.

{¶22} Both Mother and Father B. focus their arguments challenging the juvenile court's best interest determination on Mother's case plan compliance and her bond with A.H. Neither parent argues that Father B. made any progress on his case plan objectives or that he had established a relationship with his daughter. Moreover, at the time of the hearing, Father B. had recently begun serving a seven to ten-year prison sentence for multiple counts of aggravated

vehicular homicide and would not be available to provide a home for the child for the foreseeable future.

{¶23} A.H. was eleven years old at the time of the permanent custody hearing. CSB had removed the child twice from Mother's home, resulting in A.H.'s placement in CSB's temporary custody for more than four and a half years of her life. The child spent one year in Mother's home between her first removal in 2019 and her current removal in 2022. She has never lived with Father B. and has only seen him four times during her life. While in CSB's temporary custody, A.H. resided in therapeutic foster homes and, later, at Ohio Guidestone, a qualified residential treatment program.

{¶24} A.H. requires long-term services to address certain challenges and limitations. She has experienced significant trauma during her life, including sexual and physical abuse by an uncle, alleged sexual abuse by Father L., multiple removals from home and placement disruptions, abandonment by Father B., and the negative impact of Mother's deficient parenting skills. She has been diagnosed with post-traumatic stress disorder, adjustment disorder with mixed disturbances of emotions and conduct, and unspecified intellectual disability. Although she was eleven years old, she functioned on the intellectual level of a 5-7-year-old. A.H. is prone to violent outbursts, spewing profanity, and threatening self-harm and harm to others. She engages in sexualized behaviors and has touched R.L. inappropriately. She was removed from her most recent foster home after she tried to force her way into a bathroom to see a younger boy changing clothes.

{¶25} A.H.'s aggression and other inappropriate behaviors have caused tensions in her therapeutic foster homes. The caseworker and guardian ad litem testified that Mother and A.H. share a close bond. Mother visits consistently and often brings food and activities. The child questions Mother frequently about the status of the case. Instead of refocusing the child, Mother

discusses matters the agency requested she avoid. Accordingly, Mother allows A.H. to dictate their interactions. A.H. has also visited with her brother. R.L.'s foster mother testified that the siblings share a strong bond.

{¶26} In her current residential treatment facility, A.H. receives education and trauma-based therapy. As she had only recently been placed there, there was little information to report except that she would require many more months of treatment to address her aggressive and sexualized behaviors, as well as her mental health issues. One of A.H.'s therapists testified that, while the child is able to repeat information discussed during therapy sessions, A.H. is unable to apply any of those lessons in her daily life.

{¶27} A.H. expressed her desire to return to Mother's legal custody. Father B. supported his daughter's return to Mother's care. The guardian ad litem opined that an award of permanent custody was in the child's best interest. The guardian ad litem based her recommendation on Father B.'s long-term incarceration, Mother's failure to comply successfully with her case plan objectives, and Mother's lack of insight regarding the severity of A.H.'s trauma which necessitates specialized services, consistency, and close supervision.

{¶28} After close to five years in agency custody during the past six years, A.H. deserves and needs permanence. Father B. is not a permanency option due to his incarceration and lack of an established relationship with the child. Although CSB worked diligently with Mother to address the issues necessitating the child's removal from her home, Mother demonstrated minimal compliance with her case plan objectives and failed to attain insight into the child's needs and issues and her own accountability for ensuring a safe environment for A.H.

{¶29} Under the case plan, Mother had mental health, parenting, and basic needs objectives. Her basic needs objective included obtaining adequate and stable housing, maintaining

employment to provide financially for the family, ensuring a safe and secure environment for any children in the home, and addressing her criminal cases.

{¶30} Mother testified that she has been involved in mental health treatment at Ever Well Community Health ("Ever Well") for two years. She was not involved in mental health counseling during her nine-month incarceration near the beginning of the case. The caseworker agreed that Mother worked with Ever Well upon her release but that her attendance had been inconsistent. She missed many appointments early on and continued to occasionally oversleep and fail to appear for sessions. Mother had developed some coping skills to address her depression but still relied on daily (unprescribed) marijuana use in lieu of healthier options. The caseworker testified that Mother made insufficient progress on her mental health objective.

{¶31} Because CSB removed Mother's children both times based on incidents arising from the lack of parental supervision, and given A.H.'s need for consistent services to address her trauma experiences, the agency referred Mother for parenting education designed to help her develop a plan to keep the children safe and attain insight into the children's particular needs. The caseworker testified that when she tried to discuss A.H.'s sexualized behaviors and cognitive limitations with Mother, Mother responded by accusing the caseworker of calling A.H. a "pervert" and "retarded."

{¶32} The guardian ad litem expressed concerns about Mother's parenting abilities. For example, she testified that Mother was aware of the maternal uncle's sexual abuse of A.H. but failed to protect the child, instead ignoring the child's disclosure because Mother needed childcare and her brother was available to provide it. In addition, the guardian ad litem testified that Mother failed to recognize the significance of A.H.'s efforts to enter a bathroom in her foster home to see an unclothed young boy. When pressed on the matter, Mother refused to acknowledge her

daughter's inappropriate sexualized behavior or ask what she could do to address A.H.'s issues and instead blamed the foster parents for the incident. CSB added a parenting objective to the case plan to address such attitudes and responses by Mother.

{¶33} Mother participated in parenting classes during her incarceration, but the caseworker was unable to determine the substance of those courses. Because Mother demonstrated no insight regarding the children's issues and the need to provide close supervision to keep them safe, the caseworker encouraged Mother to take advantage of the more particularized parenting education available. Mother refused, believing she had complied with her objective by taking parenting classes while incarcerated.

{¶34} The caseworker also connected Mother with a provider at OhioRISE, an organization involved with addressing A.H.'s behavioral health needs, to help Mother understand the significance of the child's behavioral and trauma-based struggles and learn how she can become more involved in A.H.'s treatment. Mother missed many sessions with the provider from the beginning. She finally began meeting with the provider by Zoom but Mother tended to focus on her own stress instead of the child. The caseworker testified that Mother continued to lack any insight or even acknowledge A.H.'s needs and issues. Accordingly, both the caseworker and guardian ad litem testified that they observed no improvement in Mother's parenting skills or ability to provide a safe and healthy environment for A.H.

{¶35} As for basic needs, Mother was able to secure a three-bedroom apartment eleven months before the hearing. While she was not facing eviction, she consistently paid her rent late which required her to pay a ten percent late fee of $64.50 each month. Mother claimed the children for tax purposes one year when she was not authorized to do so. After receiving a $10,000 tax

refund, Mother furnished her apartment to provide beautifully decorated bedrooms for the children. She did not buy clothing for the children, however.

{¶36} Mother does not have a vehicle and relies on her sister or the bus system for transportation. Mother told the caseworker that she had planned to use her $10,000 tax refund to buy a car, but Mother did not follow through on that plan.

{¶37} Upon her release from incarceration, Mother obtained employment at two businesses, although she was only working as a line cook at one restaurant at the time of the hearing. Mother earns $16 per hour. While she testified that she normally worked 32-40 hours per week, she admitted that her hours fluctuate and that recently she had been working only 15 hours a week. Mother discussed seeking a second job with the caseworker who counseled her on prioritizing money for necessities rather than home decorations and Uber rides. By the time of the hearing, Mother had not sought additional employment.

{¶38} The guardian ad litem testified that Mother frequently runs out of money between paychecks. At the last visit before the hearing, Mother had no money to buy food for the children, so the guardian ad litem provided food for them.

{¶39} While Mother failed to pay her rent on time, buy a car she needed, or put money aside to provide food for the children during visits, she admitted that she spends $5 to $10 each day on marijuana. Mother does not have a prescription for marijuana. Moreover, she is forbidden under her rules of probation from using any intoxicating substance, whether legal or illegal.

{¶40} Mother is subject to other rules of probation which she has also violated, thereby placing her at risk for additional terms of incarceration which would impede her ability to provide a home for any child. Her probation officer testified that Mother has failed to report in four times, failed to submit to seven drug screens, tested positive for marijuana the seven times she did submit

to screens, and failed to make her monthly restitution payments. The probation officer testified that Mother's restitution payments may be in "any amount she can afford." Nevertheless, Mother has made only two payments, six months apart. While she paid $1000 towards restitution in one of her criminal cases, she maintained a substantial unpaid balance. Based on her non-compliance with her rules of probation, Mother was scheduled for arraignment on a probation violation. The probation officer planned to recommend additional incarceration for Mother at an overflow facility for the county jail.

{¶41} Mother argued at the hearing that she had resolved her outstanding warrant, thereby addressing her criminal cases. Her warrant was pending for over a year. Despite the repeated encouragement by the guardian ad litem to Mother to turn herself in on the warrant, Mother declined to do so. The warrant was only resolved when Mother was arrested after a court hearing early in these juvenile cases, not by any action by Mother to address the matter. Under the circumstances, Mother has not been proactive in resolving her criminal cases and, in fact, exacerbated the situation by failing to comply with her current rules of probation.

{¶42} Mother's final basic needs requirement was to demonstrate the ability to provide a safe environment for any children in her home. A.H.'s inappropriate sexual behaviors, particularly towards other children, necessitate close supervision of the child, as well as acknowledgment by Mother of the gravity of the situation. Throughout the case, Mother never developed a reasonable supervision plan to protect both A.H. and R.L. The guardian ad litem was particularly concerned, given that A.H. and R.L. had a history of engaging in sexual activity with each other by "play[ing] doctor." Moreover, Mother repeatedly minimized concerns raised by mental healthcare providers, the caseworker, and the guardian ad litem regarding A.H.'s inappropriate behaviors. Accordingly, the evidence established that Mother was not yet in a position or state of mind to ensure that A.H.

would receive the supervision and interventions required to raise the child in a safe and healthy environment.

{¶43} None of the factors set out in R.C. 2151.414(E)(7)-(11) are applicable here. Although Father B. had very little contact with A.H. during her life, CSB did not allege in its permanent custody motion, and the juvenile court did not find abandonment by Father B. under subsection (E)(10).

{¶44} After a thorough review, this Court concludes that the record demonstrates that the evidence is legally sufficient to support an award of permanent custody relating to A.H. *See Eastley*, 2012-Ohio-2179, at ¶ 11, quoting *Thompkins*, 78 Ohio St.3d at 386. In addition, there is nothing in the record to demonstrate that the juvenile court clearly lost its way and created a manifest miscarriage of justice in finding that it is in A.H.'s best interest to be placed in the permanent custody of CSB. *See Eastley* at ¶ 20. The evidence established that neither Father B., by his own admission, nor Mother was in a position to provide an appropriate home for A.H. Although A.H. wished to live with Mother, Mother lacked insight regarding the significance and severity of the child's mental health and cognitive issues. Moreover, Mother had not addressed her own mental health, substance use, parenting, or criminal issues. In addition, she struggled to meet her financial obligations even with no children in the home to support. Under the circumstances, the juvenile court did not err by finding that permanent custody is in the best interest of A.H.

{¶45} The juvenile court's termination of Mother's and Father B.'s parental rights as to A.H. is supported by sufficient evidence and is not against the manifest weight of the evidence. Accordingly, Mother's first and second assignments of error relating to A.H. and Father B.'s sole assignment of error are overruled.

**Custodial disposition of R.L.**

## MOTHER'S ASSIGNMENT OF ERROR I

THE TRIAL COURT ERRED AS A MATTER OF LAW BECAUSE [CSB] FAILED TO ESTABLISH ON THE RECORD SUFFICIENT EVIDENCE TO TERMINATE [MOTHER'S] PARENTAL RIGHTS.

## MOTHER'S ASSIGNMENT OF ERROR II

THE TRIAL COURT'S TERMINATION OF [MOTHER'S] PARENTAL RIGHTS WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

## FATHER L.'S ASSIGNMENT OF ERROR I

THE[RE] WAS INSUFFICIENT EVIDENCE TO SUPPORT AN AWARD OF PERMANENT CUSTODY AND A TERMINATION OF [FATHER L.'S] RIGHT TO PARENT R.L.

## FATHER L.'S ASSIGNMENT OF ERROR II

THE TRIAL COURT'S PERMANENT CUSTODY AWARD WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶46} Mother and Father L. argue that the juvenile court's award of permanent custody of R.L. to CSB is not supported by sufficient evidence and is against the manifest weight of the evidence. This Court disagrees.

{¶47} Our standards of review for sufficiency and manifest weight of the evidence, the agency's burden of proof, and statutory factors the juvenile court must consider when determining whether to grant a motion for permanent custody are set forth earlier in this opinion.

{¶48} As she did in regard to A.H., Mother focuses her sufficiency challenge as to R.L. on her argument that she complied with her case plan objectives. This Court reviewed the evidence regarding her case plan compliance above and concluded that CSB presented sufficient evidence to establish that Mother had not successfully completed her objectives so that she might provide a safe and stable home for any of her children. Mother failed to address her mental health issues consistently, was struggling financially and failing to prioritize basic needs over nonessentials and

was again facing the possibility of incarceration. Significantly, she refused to engage in parenting education required by CSB to emphasize the importance of parental supervision, particularly critical because the agency had removed her children both times based on incidents arising out of the lack of supervision. In fact, the first removal was premised on an incident involving R.L. Accordingly, the juvenile court's award of permanent custody of R.L. to CSB is supported by sufficient evidence.

{¶49} Father L., like Mother, does not challenge the juvenile court's first prong finding that R.L. was in CSB's temporary custody in excess of 12 months of a consecutive 22-month period. Moreover, he does not challenge the juvenile court's findings regarding the best interest of the child except to argue that permanency could have been achieved by granting legal custody to R.L.'s foster parents, thereby preserving the established bond between father and child. *See* R.C. 2151.414(D)(1)(d). We note that Mother also cites various statutory provisions relevant to foster parents assuming the status of kin; however, Mother makes no argument as to why that law renders the juvenile court's findings in support of permanent custody insufficient as a matter of law. Nevertheless, by addressing Father L.'s argument, this Court necessarily addresses any related issue Mother has attempted to raise.

{¶50} Father L. argues that R.L.'s foster parents attained the status of kin after having established a long-standing relationship or bond with R.L. under R.C. 2151.4115(A)(1). *See also* R.C. 5101.85(F). The juvenile court found that the foster parents became kin. The evidence of the child's long-term placement and bond with the foster parents supports that finding. Father L. then argues that the juvenile court erred by not placing R.L. in the foster parents' legal custody, a disposition that would have given the child the permanence he required while avoiding the termination of parental rights concomitant with an award of permanent custody.

**{¶51}** The foster parents informed the caseworker that they wished to adopt R.L. There is no evidence in the record that they indicated a willingness to seek legal custody of the child and assume the responsibilities of maintaining contact with the parents and facilitating their residual parental rights. Although R.C. 2151.353(A)(3) allows the juvenile court to award legal custody to any person where the person or any party has moved for legal custody on the person's behalf, there was no motion for legal custody to the foster parents pending for the trial court's consideration. Neither CSB nor the foster parents moved for legal custody of R.L. to his foster parents. While Father L. moved for legal custody of the child to himself, to Mother, or to himself and Mother jointly, he did not include a fourth alternative request for legal custody to the foster parents.

**{¶52}** Father L. does not cite any authority, and this Court has found none, to allow a juvenile court to award legal custody to any person on whose behalf it was not requested and who has not expressed any interest in obtaining legal custody. Moreover, the foster parents did not execute the statutorily required statement of understanding for legal custody, therefore precluding the trial court from granting them legal custody. *See* R.C. 2151.353(A)(3)(a)-(d). No viable third-party legal custodians existed in this case. Under the circumstances, Father L.'s argument that the juvenile court's failure to place R.L. in the legal custody of his foster parents rendered its finding that permanency could not be achieved without a grant of permanent custody insufficient is not well taken. Accordingly, Father L.'s first assignment of error is overruled. Moreover, to the extent that Mother's first assignment of error can also be construed as having challenged the juvenile court's failure to award legal custody of R.L. to his foster parents, it is overruled. Mother's first assignment of error is overruled in full based on our prior discussion that CSB presented sufficient evidence to demonstrate that permanent custody is in R.L.'s best interest.

{¶53} As for the parents' manifest weight arguments, this Court reiterates that neither parent challenges the trial court's first prong 12 of 22 finding. The record supports the finding that R.L. was in CSB's temporary custody for more than 12 months of a consecutive 22-month period. R.C. 2151.414(B)(1)(d). Moreover, Mother's best interest challenge again focuses on her case plan compliance. We have thoroughly reviewed the evidence and adhere to our prior conclusion that Mother did not successfully complete her objectives. Mother's lack of parenting insight and any plan for R.L.'s supervision, even in the absence of A.H. from the home; failure to consistently address her mental health issues; precarious financial status arising in part from her failure to prioritize basic needs; and ongoing involvement with the criminal justice system and likely additional incarceration, support the juvenile court's finding that permanent custody of R.L. with respect to Mother is not against the manifest weight of the evidence. Mother's second assignment of error is overruled.

{¶54} Father L. does not address the statutory best interest factors. Instead, he argues that an award of permanent custody of R.L. to CSB is against the manifest weight of the evidence based on his "relative level of misbehavior as compared to the facts that more ordinarily give rise to parental termination proceedings." Unlike criminal sentencing factors such as R.C. 2929.12(B) and (C) that require a trial court to consider, before imposing the sentence, whether the offender's conduct is more or less serious than conduct normally constituting the offense, there are no such comparative provisions in the permanent custody factors.

{¶55} Father L. argues that he is not a serial drug abuser, has never starved a child in his care, or suffered long periods of incarceration that impacted his availability to parent. While accurate, he ignores his uncooperative attitude throughout the case and failure to address many concerns underlying his specific case plan objectives.

{¶56} During the 2019 case, Father L. was living in North Carolina. Accordingly, CSB requested that North Carolina perform an ICPC assessment. The assessment recommended that Father L. obtain a mental health assessment and work on managing his mental health issues. Placement with Father L. became moot when the juvenile court returned R.L. to Mother's legal custody. After CSB initiated the current case, the agency again asked North Carolina to assess Father L.'s home. North Carolina refused because Father L. had not provided documentation that he had successfully engaged in mental health treatment. An ICPC assessment became moot after Father L. moved to Ohio in February 2023. At that time, CSB added case plan objectives for Father L.

{¶57} The agency's objectives required Father L. to obtain a mental health evaluation, comply with any treatment recommendations, and demonstrate that he could meet R.L.'s basic needs. Father L. receives social security disability income and works "odd jobs" to supplement his finances. After relocating to Ohio, he was unable to secure housing for a couple months until his assigned Veterans Affairs ("VA") case manager found him a home. Father L. refused to grant the caseworker access to his home to assess whether it is safe and appropriate for the child.

{¶58} Father L.'s mental health issues presented the biggest concerns for the caseworker and guardian ad litem. Throughout the case, Father L. was argumentative, uncooperative, and accused CSB and some of his attorneys of criminal acts involving R.L. In addition to calling everyone associated with CSB perjurers, he accused the agency of egregious crimes like kidnapping, child trafficking, and rape. There was no evidence of such wrongdoing. Visitation supervisors and the guardian ad litem frequently had to redirect Father L. during visits because he would have inappropriate conversations with R.L. about the case.

{¶59} The caseworker discussed mental health services at Community Support Services and parenting education at Red Oak, but Father L. would not engage in any services beyond some limited interaction with a VA counselor late in the case. Although Father L. purportedly executed a release of information for a prior assessment through the VA, CSB was unable to obtain that assessment because the release was not effective.

{¶60} Father L. later submitted to a mental health evaluation at the end of 2023. The assessor diagnosed him with adjustment disorder with a "rule-out diagnosis" of bipolar with psychosis and schizoaffective disorder of bipolar type. The counselor explained that a rule-out diagnosis indicates some evidence to support the diagnosis but not enough information to make a formal diagnosis. She testified that Father L.'s speech and behaviors were common to individuals with a bipolar element to their illness. Moreover, the counselor testified that Father L. made statements indicative of paranoia. He was hard to redirect and maintain on topic. Father L. spoke of satanic cults and reported that numerous entities like the police, courts, and foster care system were "out to get him."

{¶61} Father L. attended two therapy sessions after the assessment, at which time his counselor left her position with the VA. Father L. declined additional services because he did not want to meet with a new therapist. His counselor testified that Father L. did not successfully complete mental health treatment because they did not work together long enough to even fully develop treatment goals.

{¶62} During interactions with the caseworker, visitation supervisors, and library staff where community visits had begun, Father L. was argumentative, aggressive, and belligerent. Library staff were concerned when Father L. left a dog in his car during a scheduled two-hour visit. When staff tried to discuss the issue with Father L., he began yelling and berating others in

front of R.L., and he left the visit an hour early. Thereafter, CSB returned his visits to the family enrichment center. Within a month, Father L. ceased visiting with R.L. for six months because he did not see any point given "the atrocity" of CSB's involvement and handling of the case.

{¶63} R.L. has some behavioral and attention deficit issues, has seen the same counselor for over two years, and has been in a therapeutic foster home since the beginning of the case. He requires a caregiver who understands his history of trauma and will ensure his ongoing participation in mental health services. Although Father L. testified that he would continue the child in counseling, he also asserted that he would enroll R.L. in a different school district, thereby removing him from in-school therapy with his long-term counselor. The caseworker testified that Father L. has not developed coping skills or dealt with his own issues arising from the recent death of his 29-year-old son. Accordingly, there was a concern that he would not focus on R.L.'s mental health issues. The guardian ad litem went further and questioned whether Father L. would be able to independently parent the child without the consistent help of his VA case manager who attended visits and semiannual review hearings, found housing for Father L., coordinated bus routes for Father L. to attend visits, and provided other transportation as needed.

{¶64} Father L. has seven children and a history of a lack of ability to parent any of them. All seven children were involved in various child welfare systems. Father L. blamed the mothers of his children for being "inadequate" and took no responsibility for the circumstances leading to agency involvement. He testified that his four oldest children are in their 40's and he does not "bother with them." He has had no relationship with a younger daughter for some time, and he blames the child welfare system for "murder[ing]" his 29-year-old son. In this case, Father L. ceased visiting with R.L. because of his intense dislike and distrust for CSB and the child welfare system in general.

{¶65} Finally, the guardian ad litem testified and clarified why she was changing her recommendation from what she had written in her report. The report guardedly recommended legal custody of R.L. to Father L. The guardian ad litem testified, however, that after listening to Father's L.'s testimony on the second day of the hearing, she was recommending an award of permanent custody to CSB. She explained that Father L.'s fixation on identifying those involved in the case as "perjurers and child molesters" emphasized his unresolved mental health issues. The transcript of Father L.'s testimony evidences his utter distrust and vitriol for the agency and legal system involved with R.L. Moreover, his testimony was disjointed, rambling, and difficult to follow much of the time.

{¶66} Based on a thorough review of the record, this is not the exceptional case in which the trier of fact clearly lost its way and created a manifest miscarriage of justice by finding that an award of permanent custody is in R.L.'s best interest. Father L. does not challenge the juvenile court's findings on most of the best interest factors. Nevertheless, the record supports the findings that Father L. has never had custody of the child; that the two share a bond, although Father L.'s behavior and focus causes stress for the child; that R.L. could not articulate his desire regarding custody at the time of the hearing; that the guardian ad litem recommended permanent custody in the child's best interest; and that Father L. had abandoned R.L. for almost six months during the case. *See* R.C. 2151.414(D)(1)(a), (b), (c), and (e); R.C. 2151.414(E)(10). As to the child's need for a legally secure permanent placement and whether permanency can be achieved without permanent custody under R.C. 2151.414(D)(1)(d), Father L.'s lack of case plan compliance, particularly as it relates to his untreated mental health issues, supports the award of permanent custody. Accordingly, the juvenile court's judgment is not against the manifest weight of the evidence. Father L.'s second assignment of error is overruled.

**FATHER L.'S ASSIGMENT OF ERROR III**

[FATHER L.] WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL.

{¶67} Father L. argues that his trial counsel failed to provide him with effective assistance of counsel. This Court disagrees.

{¶68} "The test for ineffective assistance of counsel in permanent custody cases is the same as that applicable to criminal cases." *In re A.R.*, 2021-Ohio-2573, ¶ 36 (9th Dist.), quoting *In re C.M.*, 2007-Ohio-3999, ¶ 27 (9th Dist.). A party claiming ineffective assistance must demonstrate both deficient performance by the attorney and resulting prejudice. *Id.*, citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984), and *State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraph two of the syllabus. This Court applies an objective standard of reasonableness when determining whether counsel's performance was deficient. *Strickland* at 687-688. Ineffective assistance requires a "substantial violation of . . . counsel's essential duties" to the client. *Bradley* at 141, quoting *State v. Lytle*, 48 Ohio St.2d 391, 396 (1976). "To establish prejudice, the appellant must prove that there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different." *In re A.R.* at ¶ 36 (9th Dist.), citing *Strickland* at 694. The test is conjunctive and requires proof of both prongs; accordingly, "this Court may dispose of the claim based solely on the appellant's failure to demonstrate either deficient performance or the requisite prejudice." *In re A.R.* at ¶ 36 (9th Dist.), citing *Bradley* at 142-143.

{¶69} Father L. argues that his trial counsel was ineffective for failing to (1) object to R.L.'s adjudication as an abused and neglected child, and (2) timely obtain ICPC documents and object to hearsay concerning Father L.'s previous ICPC applications.

{¶70} As to the adjudication, Father L. concedes that R.L.'s home environment supported his adjudication as a dependent child. He argues only that there was insufficient evidence to establish the child was abused and neglected, and counsel did not file objections to the magistrate's findings.[1]

{¶71} Father L. did not ensure that the appellate record contained a transcript of the adjudicatory hearing. "[I]t is the duty of the appellant to ensure that the record on appeal is complete." *In re R.A.*, 2008-Ohio-6745, ¶ 4 (9th Dist.). Accordingly, this Court must presume regularity in the trial court proceedings. *In re G.G.*, 2022-Ohio-1654, ¶ 15 (9th Dist.).

{¶72} Moreover, Father L. has not demonstrated that he suffered any prejudice based on trial counsel's failure to object to the adjudication. By conceding that R.L.'s home environment supported a finding of dependency, the juvenile court assumed jurisdiction over the child and parents. *In re C.T.*, 2024-Ohio-5083, ¶ 13 (9th Dist.) ("The adjudication of a child as dependent, neglected, or abused is the jurisdictional 'hook' which allows for the on-going intervention by the State in the lives of children and their parents.")

{¶73} While he argues that his case plan objectives were "quantitatively and qualitatively different" from what they would have been if the juvenile court had adjudicated R.L. only dependent, Father L. has not explained how his basic needs and mental health objectives were more onerous than they would have been had the juvenile court merely adjudicated the child dependent. CSB was required to create case plan objectives, in consideration of the best interest of the child, to help the parents address and eliminate any concerns preventing the child's safe

---

[1] In his reply brief, Father L. asserts that his trial counsel waived the adjudicatory hearing on his behalf and stipulated to adjudication. A review of the magistrate's July 28, 2022 decision, however, indicates that only Mother waived her right to a hearing and the magistrate heard testimony in support of the allegations CSB alleged in its complaint.

return home. R.C. 2151.412(G)(1). The agency was aware of concerns regarding Father L.'s mental health based on its prior involvement with him in the 2019 case, as well as Father L.'s behavior and beliefs during the current case. In addition, while the ability to meet a child's basic and special needs is always a paramount concern, in this case, CSB was aware that Father L. had not established housing for some months after he relocated to Ohio. Under these circumstances, Father L. has not demonstrated, particularly in light of his concession that his son was dependent, that trial counsel's failure to object to R.L.'s adjudication as an abused and neglected child prejudiced him.

{¶74} As to the ICPC documents, Father L. acknowledges that his attorney at the permanent custody hearing had been recently appointed and reviewed all the numerous discovery documents provided. Father L. takes issue with the failure of either of his prior two attorneys to request the ICPC documents. However, because Father L. relocated to Ohio during the case, placement or assumption of custody of the child by Father L. was not dependent on ICPC approval. Accordingly, the substance of any ICPC assessments was not relevant, and counsel's failure to obtain those documents did not prejudice Father L.

{¶75} Nevertheless, Father L. argues that trial counsel was ineffective for failing to object to hearsay testimony regarding his ICPC assessments. He cites to five pages of the transcript relevant to his argument. The first three pages are testimony by Father L. himself during which he testified about his involvement in the 2019 case and his participation in a mental health assessment on his own initiative, not under requirement by CSB. Father L. does not explain how his own testimony served to prejudice him. Moreover, when the assistant prosecutor asked Father L. whether he was "required to participate in some ICPC services," his attorney objected to that line of questioning. Thereafter, the juvenile court admonished the assistant prosecutor for

attempting to elicit testimony regarding the substance of Father L.'s ICPC. Under these circumstances, Father L.'s counsel acted reasonably to protect his client.

{¶76} The remaining two pages Father L. cites involve testimony by the caseworker. On the first page, Mother's attorney questioned the caseworker as to how Father L. was noted on the case plan. The caseworker testified that he was included under R.L.'s objectives on the case plan because Father L. was living in North Carolina and CSB was not able to provide hands-on services. Instead, the agency had to request an ICPC assessment by the North Carolina agency. The caseworker noted that "the ICPC was rejected[,]" but she did not elaborate as to why. Accordingly, there was no testimony regarding Father L.'s alleged failure to cooperate or address his mental health to which counsel could have been expected to object.

{¶77} On the last page cited by Father L., his own attorney was questioning the caseworker, merely following up on how the agency structured Father L.'s objectives on the case plan. The caseworker testified that Father L.'s objectives addressed the need for him to engage with CSB, cooperate with the ICPC process, sign releases, discuss family members, and respond to correspondence regarding R.L. Again, the caseworker did not testify that Father L. had failed to cooperate or address identified issues; she explained merely what the case plan required of him.

{¶78} For the above reasons, this Court cannot conclude that Father L.'s counsel rendered ineffective assistance below. Father L. failed to establish deficient performance and/or prejudice relating to counsel's representation. Accordingly, Father L.'s third assignment of error is overruled.

### FATHER L.'S ASSIGNMENT OF ERROR IV

CUMULATIVE ERROR [ARISING OUT OF THE INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL REQUIRES REVERSAL.]

{¶79}  Father L. argues that the cumulative effect of the ineffective assistance of his trial court deprived him of a fair hearing.  This Court disagrees.

{¶80}  This Court previously recognized a cumulative error argument challenging an award of permanent custody in *In re F.B.*, 2019-Ohio-1738, ¶ 46-47 (9th Dist.).  We wrote that "although individual errors during trial may not rise to the level of reversible error, the combined prejudice resulting from those errors may rise to the level of reversible error."  *Id.* at ¶ 47, citing *State v. DeMarco*, 31 Ohio St.3d 191(1987), paragraph two of the syllabus.  As in *In re F.B.*, Father L. has failed to argue or demonstrate any prejudice arising from trial counsel's alleged ineffectiveness.  *See In re F.B.* at ¶ 47 (9th Dist.).  As such, he cannot demonstrate cumulative error.  Father L.'s fourth assignment of error is overruled.

III.

{¶81}  Mother's, Father B.'s, and Father L.'s assignments of error are overruled.  The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

---

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution.  A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run.  App.R. 22(C).  The Clerk of the Court of Appeals is instructed to

mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed equally to Appellants.

_____
SCOT STEVENSON
FOR THE COURT

CARR, J.
SUTTON, J.
CONCUR.

APPEARANCES:

ANDREW KARAS, Attorney at Law, for Appellant.

JASON JORDAN, Attorney at Law, for Appellant.

KIMBERLY STOUT-SHERRER, Attorney at Law, for Appellant.

ELLIOT KOLKOVICH, Prosecuting Attorney, and AARON B. CAMPBELL, Assistant Prosecuting Attorney, for Appellee.

ANNETTE POWERS, Guardian ad Litem.